WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| TD Professional Services,<br><br>            Plaintiff,<br><br>v.<br><br>Truyo Incorporated, et al.,<br><br>           Defendants. | No. CV-22-00018-PHX-MTL<br><br>**ORDER** |

Pending before the Court is a motion for partial summary judgment (Doc. 177) filed by Defendants Truyo Inc. and Interedge Inc. (collectively, "Defendants"). Defendants move for summary judgment on Plaintiff TD Professional Services' ("Plaintiff") patent infringement and promissory estoppel claims.[1] The motion is fully briefed. (Docs. 177, 202, 217.) The Court held oral argument on the motion on November 7, 2024. (Doc. 218.) For the forthcoming reasons, the Court grants Defendants' motion (Doc. 177).

**I.    BACKGROUND**

Plaintiff owns U.S. Patent Nos. 10,304,062 and 10,628,833 (the "'062 Patent" and the "'833 Patent," respectively; collectively, the "Patents-in-Suit"). (Doc. 111 at 1.) The '062 Patent was issued May 28, 2019, and the '833 Patent was issued April 21, 2020.

---

[1] Defendants asserted seven counterclaims against Plaintiff (*see* Doc. 65), and neither party moved for summary judgment on these. The counterclaims are: (1) Declaratory Judgment of Non-Infringement of the '833 Patent, (2) Declaratory Judgment of Non-Infringement of the '062 Patent, (3) Declaratory Judgment of Invalidity of the '833 Patent, (4) Declaratory Judgment of Invalidity of the '062 Patent, (5) Declaratory Judgment of Unenforceability, (6) Declaratory Judgment of Co-Ownership, (7) Violation of Arizona Patent Troll Prevention Act, A.R.S. §§ 44-1421–1424.

(Doc. 177-1 at 145, 162.) The Patents-in-Suit claim a computer system and methods that employ blockchain-based technology for data regulation compliance. (*Id.*) Defendants offer a compliance software product for the European Union's General Data Protection Regulation ("GDPR"). (Doc. 65 ¶ 22.) Plaintiff alleges that Intraedge's products and related methods directly infringe the Patents-in-Suit and that Intraedge induced Truyo to infringe the same. (Doc. 60 ¶¶ 81-96.) The Court discussed the Patents-in-Suit in detail in its February 3, 2023 Claim Construction Order. (Doc. 111.) Rather that repeat them here, the Court will discuss any relevant facts in the forthcoming analysis.

Plaintiff also alleges a promissory estoppel claim against Defendants. (Doc. 60 ¶¶ 97-101.) Back in 2017, Plaintiff's principal, Scott Heins, began working for Interedge to develop "GDPR Edge," an earlier version of the accused product, the "Truyo System" or the "Truyo Platform." (Doc. 177-4 at 3-5; Doc. 177-5 at 3-4; Doc. 202-12 at 3-5.) Plaintiff entered into a non-disclosure agreement with Interedge in April 2017 to facilitate the exchange of confidential information. (Doc. 177-1 at 40; Doc. 197 at 2-5.) On September 18, 2017, Interedge and Plaintiff signed the IP Licensing Term Sheet ("Term Sheet"), which provided that the parties agreed to "negotiate in good faith toward a definitive agreement" with respect to licensing the technology from Plaintiff. (Doc. 202-7 at 2.) The parties never entered "a definitive agreement" after the Term Sheet expired on November 21, 2017. (Doc. 177-5 at 3-4.) Plaintiff alleges that Interedge promised to:

> 1) "take proper care" to protect Plaintiff's interest in its technology; 2) "only use the IP pursuant to the knowledge of [Plaintiff] . . . without any exceptions"; 3) agree that any improvements to the intellectual property developed by Interedge during the commercialization process would be the sole property of Plaintiff; and 4) never produce any product that potentially replicated or "competed" with Plaintiff's technology.

(Doc. 60 ¶ 98.) Plaintiff claims that "[t]hese promises were acknowledge in the [T]erm [S]heet signed on September 18, 2017." (*Id.*) Plaintiff alleges that it detrimentally relied on these promises by Interedge. (*Id.* ¶¶ 99-100.)

## II. LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins.*, *Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, and that the issue is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor. *First Nat'l Bank of Ariz. v. Cities of Serv. Co.*, 391 U.S. 253, 288-89 (1968). The nonmovant must, however, "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotations and citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, a court must not "weigh the evidence and determine the truth" but to "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In its analysis, a court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. A court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III. ANALYSIS

### A. Patent Infringement

Plaintiff alleges claims of direct infringement (literally or under the doctrine of equivalents) and inducement to infringe both patents '062 and '833. (Doc. 60 at 16-19.)

Defendants argue that the accused product cannot be infringing the Patents-in-Suit because the asserted claim limitations require hardware, and the accused product is solely a software product. (Doc. 177 at 6, 16-18.) Specifically, Defendants claim that the accused product does not contain an "automated compliance network appliance," a "network interface connection," and a "data collection terminal"—all physical hardware. (*Id.*) Defendants also alternatively argue that the accused product does not have a "data lake" limitation. (*Id.* at 18-20.)

The Court adopted the following constructions for the claim terms at issue here in its February 3, 2023 Claim Construction Order.

| Claim Term | Term Location | Adopted Construction |
| --- | --- | --- |
| "automated compliance network appliance" | '062 Patent, Cl. 17(c) '833 Patent, Cl. 18(c) | A physical device (having a processor, memory and local storage) |
| "network interface connection" | '062 Patent, Cl. 17(c) '833 Patent, Cl. 18(c) | A physical USB drive or physical router |
| "data collection terminal" | '062 Patent, Cl. 17(a) '833 Patent, Cl. 18(a) | A terminal for collecting data that includes a compliance device driver |
| "data lake" | '062 Patent, Cl. 17(e) '833 Patent, Cl. 18(e) | A data repository that stores raw, unstructured data, and is not a database |

(Doc. 111 at 5.)

Patent infringement analysis proceeds in two steps: (1) the Court construes the asserted claims as a matter of law; and (2) the factfinder compares the properly construed claims to the accused device. *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1350-51 (Fed. Cir. 2022). "Summary judgment of noninfringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim is found in the accused device either literally or under the doctrine of equivalents." *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1317 (Fed. Cir. 2015).

As an initial matter, "[p]atent rights are created only upon the formal issuance of the patent*.*" *GAF Bldg. Materials Corp. v. Elk Corp. of Dallas*, 90 F.3d 479, 483 (Fed. Cir. 1996); 35 U.S.C. § 154(a). Much of Plaintiff's evidentiary support predates the '062 patent

issue date of May 28, 2019. (*See, e.g.,* Doc. 202 at 5-6, 20.) As such, the Court focuses its analysis using evidence from May 28, 2019, and onward.

### 1.  Direct Infringement

Defendant argues that the accused product is exclusively software. (Doc. 177 at 6, 16-18.) The Court defined both "automated compliance network appliance" and "network interface connection" as "physical" components in the Claim Construction Order. (Doc. 111 at 5.)

Defendants provide ample evidence that the accused product consists of software only. Dr. Jonathan Katz, Defendants expert, attests that the accused product "consists of software, exclusively" and that "[n]o hardware is provide as part of the [accused product's] sale." (Doc. 177-3 at 7, 10; *see also* Doc. 181 at 14-16.) In addition, Defendants' employee Rod Forsythe attests that by the end of 2018 he began to develop "a software solution lacking any of the cumbersome hardware components of the GDPR Edge platform and written in an entirely different programming language" and this "software solution became known as the 'Truyo' platform." (Doc. 177-4 at 4-5; *see also* Doc. 181 at 76-81.) Mr. Forsythe explains while citing to sample buildouts of the accused product that it "does not include any physical hardware, such as (1) a physical [automated compliance network appliance]; (2) a physical network interface connection; and/or (3) a physical data collection terminal." (*Id.*)

Plaintiff, however, only presents one piece of evidence that the accused device uses hardware after May 28, 2019—deposition testimony from Mr. Heins explaining that, when he was involved as an executive sponsor for a project with a company called Savers, Truyo "was selling and installing and representing to the market as late of December 2020 was the exact same platform that they had built based on my invention." (Doc. 202-10 at 4.) This testimony alone is not enough to defeat summary judgment. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) ("However, this court has refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony."); *Angelette, LLC v. Bradley*, 674 F. Supp. 3d 687, 695 (D. Alaska

2023) ("Similarly, no genuine dispute exists where the only evidence presented is 'uncorroborated and self-serving' testimony." (citation omitted)); *Workman v. Dearborn Nat'l Life Ins. Co.*, 434 F. Supp. 3d 799, 801 (C.D. Cal. 2020) (same).

Plaintiff also relies on deposition testimony from its rebuttal expert, Nick Ferrara, indicating that some hardware may be used in the Truyo System. The deposition excerpt provides:

> Q. All right. One other question.
> Is an Intel Retail Gateway device a physical device having a processor, memory, and local storage and the network interface connection therein is a physical USB drive or physical router?
> A. Yes. In fact, I think there's a picture of it in one of my reports. If you'll give me a second, I'll just point you to it. Let me see where it is.
> Yeah. I think I discussed this in paragraph 143 of my rebuttal report. One of the presentations points to a device with an Adam CPU, one terabyte of local storage, and a network interface.
> So this is definitely a hardware component that I've seen references to, and I've seen emails where someone from Truyo – I forget who – talks about how they expect implementation of the system will drive sales of this kind of device.

(Doc. 202-8 at 15-16.)

Mr. Ferrara's testimony, however, does not give the Court sufficient detail to find a material disputed fact. First, Plaintiff does not submit the rebuttal expert report for the Court to examine which picture Mr. Ferrara's testimony relies on. Second, the deposition testimony does not offer the date of the emails, meaning the email could predate May 2019.[2] Third, the latter part of Mr. Ferrara's testimony could mean the implementation of the Truyo System software would drive independent sales of the "device," the Intel Retail Gateway.[3]

---

[2] Plaintiff included in the exhibits an email exchange from October 30, 2018, that discusses GDPR Edge's use of the Intel Retail Gateway. (*See* Doc. 197-3.) The Court did not find an email discussing Truyo's use of the Intel Retail Gateway in the record.

[3] When Plaintiff initially worked on GDPR Edge in 2017, Interedge contracted with Intel to provide consulting services to provide a proof of concept to use the Intel Retail Gateway

Even if this testimony is enough to create a material disputed fact, the Court finds that the accused product still does not have a "data collection terminal." Defendants argue that the term "data collection terminal" is physical hardware. (Doc. 177 at 11, 16-17.) Plaintiff argues that a "data collection terminal" does not require physical hardware. (Doc. 202 at 8-9.)

The Court defined "data collection terminal" as "[a] terminal for collecting data that includes a compliance device driver." (Doc. 111 at 5, 7-10.) The Court also found a "compliance device driver" as "[s]oftware, resident in the data collection terminal, that intercepts the data input." (Doc. 111 at 5.) Plaintiff argues that a data collection terminal does not require hardware because the Court explained that "nothing in the intrinsic record requires that the compliance device driver itself be a hardware component within the data collection terminal." (Doc. 202 at 9; Doc. 111 at 15.) Yet, this only means that a component of the data collection terminal is software, not that the data collection terminal itself can be software or hardware. In fact, the Court explained in its analysis of defining "data collection terminal" that "Plaintiff's expert testimony that a person of ordinary skill in the art would ordinarily refer to *a driver as software that is stored on hardware*, . . . ." (Doc. 111 at 15 (emphasis added.)) Meaning, a data collection terminal is hardware that stores the compliance device driver.

Defendants provide evidence that a data collection terminal is physical hardware. Dr. Katz explains that the Court's construction of the term "indicates that a data collection terminal should be hardware-based" and that "a person of ordinary skill in the art would understand 'terminal' to mean a physical device that stores (or 'includes') software." (Doc. 177-1 at 181; Doc. 177-3 at 9.) Mr. Heins even acknowledges a data collection terminal is typically a physical device. (Doc. 177-1 at 91.) Furthermore, Defendants' expert explains that "there is no hardware data collection terminal operated by Truyo." (Doc. 177-1 at 183.)

Finally, Plaintiff does not identify any evidence in the record that the accused

---

device as part of its development of the GDPR Edge. (Doc. 197-1 at 2-4.)

- 7 -

product uses a data collection terminal in the form of software or hardware. Even at oral argument the Court asked, "Where in the evidentiary record does [Defendants'] accused product use a data collection terminal?" (Doc. 220 at 66.) Plaintiff's counsel responded that "the data collection terminal is a term in the patent" and explained again that the Court found "[n]othing in the intrinsic record requires that the compliance device driver itself be a hardware component within the data collection terminal." (*Id.*) Plaintiff's counsel did not identify in the record where the accused product uses a data collection terminal comprised of software or hardware. (*See id.*)

Given these undisputed facts viewed in the light most favorable to Plaintiff, the Court finds that the accused product does not contain a data collection terminal or its equivalent, and therefore, the accused product is not directly infringing either Patents-in-Suit.[4] *See Advanced Steel Recovery, LLC*, 808 F.3d at 1317; *Bird Barrier Am., Inc. v. Bird-B-Gone, Inc.*, 676 F. Supp. 2d 929, 931 (C.D. Cal. 2009) ("If the plaintiff cannot prove that the defendant's device has every claim limitation, summary judgment should be granted in the defendant's favor.").

Accordingly, the Court grants Defendants' motion with respect to the claims of direct infringement of the Patents-in-Suit.[5]

### 2. Inducement to Infringe

Plaintiff alleges an inducement to infringe claim in conjunction with the direct infringement claim. Yet, without any direct infringement, there can be no inducement to infringe. *Niazi Licensing Corp.*, 30 F.4th at 1351; *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1353-54 (Fed. Cir. 2008) ("To prevail on inducement, the patentee must show, first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to

---

[4] "An element in the accused product is equivalent to a claim element if the differences between the two are insubstantial to one of ordinary skill in the art." *Cortland Line Co. v. Orvis Co.*, 203 F.3d 1351, 1359 (Fed. Cir. 2000) (citation omitted). Plaintiff does not argue that the accused product contains the equivalents of the claim terms raised by Defendants, and as such, the Court does not review whether the equivalents exist. (*See* Doc. 202.)

[5] Defendants argue in the alternative that the accused product does not use the claim term "data lake." The Court need not address this argument because it finds that the accused product does not have a data collection terminal.

- 8 -

encourage another's infringement."); *Largan Precision Co., Ltd v. Genius Elec. Optical Co.*, 86 F. Supp. 3d 1105, 1117 (N.D. Cal. 2015). Accordingly, the Court will grant Defendants' motion with respect to the inducement to infringe the Patents-in-Suit claims.

### B. Promissory Estoppel

Defendants argue that a promissory estoppel claim cannot exist as a matter of law because the Term Sheet is a binding contract and the promises alleged are outlined in the Term Sheet. (Doc. 177 at 20-22.) Plaintiff argues that the Term Sheet is not a contract but an agreement to negotiate toward a binding, definitive licensing contract. (Doc. 202 at 16-18.) Plaintiff argues that a reasonable jury could conclude that the Term Sheet was not a contract. (*Id.* at 18.) Plaintiff also argues that the Term Sheet cannot be a contract because the parties lacked a "meeting of the minds." *(Id.* at 18.)

Under Arizona law, contract interpretation is a question of law for the Court, not a jury, to decide. *Hadley v. Sw. Properties, Inc.*, 116 Ariz. 503, 506 (1977). "An enforceable contract requires an offer, acceptance, consideration, and sufficient specification of terms." *State Farm Mut. Auto. Ins. Co. v. Frank*, 257 Ariz. 228, 234 (App. 2024). "[M]onetary consideration is not always required as consideration. Adequate consideration consists of a benefit to the promisor and a detriment to the promisee." *Carroll v. Lee*, 148 Ariz. 10, 13 (1986). When interpreting a contract, the Court must first look to "the plain meaning of the words as viewed in the context of the contract as a whole" to determine the parties' intent. *Great W. Bank v. LJC Dev., LLC*, 238 Ariz. 470, 475 (App. 2015).

A promissory estoppel claim exists when there is "a promise, which the promissor should reasonably foresee would cause the promisee to rely, upon which the promisee actually relies to his detriment." *Satamian v. Great Divide Ins. Co.*, 257 Ariz. 136, 144 (2024) (citation omitted). "Reliance is justified when it is reasonable but is not justified when knowledge to the contrary exists." *Higginbottom v. State*, 203 Ariz. 139, 144 (App. 2002). "There can be no implied contract where there is an express contract between the parties in reference to the same subject matter." *Chanay v. Chittenden*, 115 Ariz. 32, 35 (1977); *Tohono O'odham Nation v. Ducey*, 174 F. Supp. 3d 1194, 1207-08 (D. Ariz. 2016)

("Arizona law prohibits an action based on the promissory estoppel theory of liability if there is an express, written contract on the same subject matter.").

The Court finds that the Term Sheet is a contract as a matter of law. Here, the offer is the opportunity to negotiate a licensing agreement with the prospective terms for the Term Sheet. (Doc. 181 at 144-147.) The acceptance is shown by the signature of each party at the end of the Term Sheet. (*Id.* at 148.) The consideration given by Plaintiff is the agreement to exclusively negotiate with Defendants, and Defendants receive the opportunity of this exclusivity. (*Id.* at 146.) Finally, the Term Sheet was "good for 90 days from the date of August 23, 2017." (*Id.* at 144.) "Under specific Arizona law, a contract may be formed, under these circumstances, if it is clear that the parties intended to bind themselves to the terms." *Peak Invs. LLC v. Harter Indus., Inc.*, 2001 WL 34779369, *4 (D. Ariz. Oct. 22, 2001) (concluding that a letter of intent "was binding for 120 days and during that time the parties were required to negotiate with each other exclusively" but that no deal was reached because the parties did not enter into a definitive purchase agreement).

Plaintiff argues that in *Inter-Tel, Inc. v. Bank of America, Arizona*, 195 Ariz. 111, 116 (App. 1999), the court found that a term sheet was not a contract, and this should apply here. In *Inter-Tel*, the court reasoned that the term sheet was not a contract because it was accompanied by a letter that explicitly stated the term sheet was to be used to "facilitate negotiations" and "not meant to be and shall not be construed as a commitment or an attempt to define all the terms and conditions." *Id.* ¶ 30.

Now, the Term Sheet here does contain a provision that indicates it is a tool to facilitate negotiations: "Upon acceptance of this TERM SHEET the parties will promptly negotiate in good faith toward a definitive agreement in respect to licensing of the IP." (Doc. 179 at 144.) Yet, this Term Sheet also provides additional specific terms than those discussed in *Inter-Tel*, including incorporating costs and expenses, each parties' obligations, revenue definition, specific licensing fees and timing of payment, a buy-out provision, and "other usual and customary terms and conditions for arrangement of this nature." *See Inter-Tel*, 195 Ariz. at 115-16. (*Id* at 144-146.) Furthermore, the most striking

provision, the "Binding Effect" provision, shows it is a contract:

> Until acceptance of this TERM SHEET by signature of both BUYER and SELLER the understandings contained herein do not constitute a binding agreement between the parties, but merely express their intent with respect the TERM SHEET. *The understandings contained herein shall become binding by signature of both BUYER and SELLER to this TERM SHEET.*

(*Id.* at 147 (emphasis added).) This provision expressly states that upon signature of the parties the agreements defined in the term sheet became binding. *See Johnson Int'l, Inc. v. City of Phoenix*, 192 Ariz. 466, 470 (App. 1998) ("A contract may be formed, even if not formally executed, if it is clear the parties intended to bind themselves to the terms.").

Plaintiff finally argues that no "meeting of the minds" occurred. Specifically, Plaintiff claims that Defendants on multiple occasions stated that the Term Sheet was not a contract. (Doc. 202 at 16-18.) A review of the documents submitted by Plaintiff, however, do not show that Defendants deny the existence of a contract. For example, the July 7, 2020 letter from Interedge's counsel explains the Term Sheet is no longer valid because it expired years ago. (Doc. 202-11 at 20.) In an August 4, 2020 letter, Interedge also explains that "the parties had no discussions for nearly three years further shows that both sides understood that the negotiation attempts had ended." (Doc. 177-1 at 252.) Plaintiff also cites Defendants' Answer, where they explain again that the Term Sheet constituted an agreement to negotiate that expired within ninety days. (Doc. 65 at 5.) None of the evidence suggests that Defendants disagree that the Term Sheet was a binding contract, only that it was a temporary agreement. Finally, the record shows that even Plaintiff agrees that the Term Sheet was a written agreement. (Doc. 177-1 at 68.) In a deposition, Mr. Heins testified that "My personal opinion was that [the Term Sheet] was an agreement, yes." (*Id.*) Therefore, the Court finds that the Term Sheet is a contract.

The Court also finds the promissory estoppel claim fails as a matter of law because the promises cited by Plaintiff arise out of the promises made in the Term Sheet. The promises alleged by Plaintiff align with Interedge's obligations under the Term Sheet

including "*take proper care* of the entrusted IP and other properties of [Plaintiff]," "*only use the IP pursuant to the knowledge of [Plaintiff]* and within the terms of the AGREEMENT *without any exceptions*," "[a]ny derivative changes or *improvements to the IP* performed or *developed by INTEREDGE* remain the *sole property of [Plaintiff]*," and "INTEREDGE shall not, separate from the AGREEMENT, produce, practice, or sell any products or services that infringe of *compete with the IP*." (*Compare* Doc. 202-7 at 2, 4 (emphasis added), *with* Doc. 60 ¶ 98.)

Defendants do not deny that the Term Sheet expired on November 21, 2017—meaning that any promises made after the express, written agreement expired could potentially fall under a promissory estoppel claim. Yet, Plaintiff does not plead, argue, or provide any evidence of any actionable promises made *after* the Term Sheet expired. (*See* Docs. 60, 197, 202.)

Accordingly, the Court grants Defendants' motion for summary judgment with respect to the promissory estoppel claim.

**IT IS THEREFORE ORDERED granting** Defendants' motion for partial summary judgment (Doc. 177). Summary judgment is awarded to Defendants on Plaintiff's patent infringement claims (First and Second Cause of Action) and promissory estoppel claim (Third Cause of Action) (Doc. 60 ¶¶ 81-101).

**IT IS FURTHER ORDERED** the Clerk of Court must not enter judgment at this time.

**IT IS FINALLY ORDERED** affirming the trial setting conference set for **Tuesday, December 10, 2024, at 4:00 PM** (Doc. 218).

Dated this 9th day of December, 2024.

Michael T. Liburdi
United States District Judge